UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| W.P. | * |
| | * CIVIL DOCKET NUMBER: 19-2383 |
| Plaintiff | * |
| | * SECT: |
| VERSUS | * |
| | * JUDGE: |
| MARLIN N. GUSMAN, ORLEANS | * |
| PARISH SHERIFF; OPSO DEPUTY | * MAG: |
| JOHNSON; OPSO DEPUTY | * |
| JOHNSON 2; AND UNKNOWN | * |
| OPSO DEPUTIES JOHN DOES 1, 2, | * |
| AND 3. | * |
| | * |
| Defendants. | * |

*********************************

## COMPLAINT

This case involves the failure of the defendants, Sheriff Marlin Gusman and various deputies, to protect the plaintiff from sexual assaults and abuse at the Orleans Justice Center ("OJC"). Indeed, it appears that rather than preventing the assaults, defendant deputies actually assisted the inmate-perpetrators in committing their violent attacks on the Plaintiff. This is yet another tragic example of the on-going dysfunction and mismanagement at the OJC.

### I. JURISDICTION

1.      This action is brought pursuant to 42 U.S.C. §§ 1983. Jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343, and the Fourth, Eighth, and Fourteenth Amendments to the Constitution of the United States. Plaintiff also invokes supplemental jurisdiction over claims under state constitutional and statutory law, pursuant to 28 U.S.C. § 1367.

## II. PARTIES

### (Plaintiff)

2.      **W.P.** is an adult citizen of the State of Louisiana and is currently domiciled in the Eastern District of Louisiana.[1]

### (Defendants)

Named defendants herein are:

3.      **MARLIN N. GUSMAN,** who is sued in his individual and official capacity as Sheriff of Orleans Parish, is an adult citizen of the State of Louisiana and domiciled in the Eastern District of Louisiana.  At all times described herein, he was the Sheriff of Orleans Parish and, as such, was responsible for the hiring, training, supervision, discipline and control of appropriate staff to maintain the care, custody and control of prisoners in his charge.  He was responsible for all staffing levels of Orleans Parish Sheriff's Office ("OPSO") facilities.  He was also responsible for the supervision, administration, policies, practices, customs, and operations of the OPSO and its correctional facilities.  He was and is a final policy maker, and at all pertinent times was acting under color of law.  He is liable both directly and vicariously for the actions complained of herein.

4.      **OPSO DEPUTY JOHNSON**, who is sued in his individual and official capacity as a deputy of the Orleans Parish Sheriff's Office, is an adult citizen of the State of Louisiana and domiciled in the Eastern District of Louisiana.  At all pertinent times, defendant **JOHNSON** was employed by defendant **GUSMAN** as a correctional

---

[1] By separate motion, the Plaintiff has requested permission from this Court to proceed in this matter anonymously because of the nature of the allegations.

officer and was acting under color of law.  At all pertinent times, he was acting in the course and scope of his employment with **GUSMAN**.

5.      **OPSO DEPUTY JOHNSON NO. 2**, who is sued in his individual and official capacity as an Orleans Parish Sheriff's Deputy, is an adult citizen of the State of Louisiana and domiciled in the Eastern District of Louisiana.  At all pertinent times, defendant **JOHNSON NO. 2** was employed by defendant **GUSMAN** as a correctional officer and was acting under color of law.  At all pertinent times, he was acting in the course and scope of his employment with **GUSMAN**.

6.      **UNKNOWN OPSO DEPUTY JOHN DOE NO. 1**, who is sued in his individual and official capacity as an Orleans Parish Sheriff's Deputy, is an adult citizen of the State of Louisiana and domiciled in the Eastern District of Louisiana.  At all pertinent times, defendant **UNKNOWN OPSO DEPUTY JOHN DOE NO. 1** was employed by defendant **GUSMAN** as a correctional officer and was acting under color of law.  At all pertinent times, he was acting in the course and scope of his employment with **GUSMAN**.

7.      **UNKNOWN OPSO DEPUTIES JOHN DOES NOS. 2 and 3**, who are sued in their individual and official capacities as Orleans Parish Sheriff's Deputies, are adult citizens of the State of Louisiana and domiciled in the Eastern District of Louisiana.  At all pertinent times, defendants **UNKNOWN OPSO DEPUTIES JOHN DOES NOS. 2 and 3,** were employed by defendant **GUSMAN** as correctional officers and were acting under color of law.  At all pertinent times, they were acting in the course and scope of their employment with **GUSMAN**.

### III. FACTUAL ALLEGATIONS

8.      In June 2018, the Plaintiff was a participant in the Orleans Parish Criminal District Court's Drug Court program.  He had entered the program after pleading guilty to possession of heroin and misdemeanor possession of drug paraphernalia.  Although the Plaintiff was continuing to struggle with his long-term addiction issues, by June 2018 he had been promoted to Phase 4 in Drug Court.

9.      On June 15, 2018, an Orleans Criminal Court Judge ordered the Plaintiff to serve a weekend in jail based on a failed drug test.  The Plaintiff was remanded to the custody of defendant **GUSMAN.**

10.      On or about June 15, 2018, defendant **UNKNOWN OPSO DEPUTY JOHN DOE NO. 1** was responsible for the classification and placement of inmates who were entering the custody of defendant **GUSMAN** at the OJC.  **UNKNOWN OPSO DEPUTY JOHN DOE NO. 1** caused the Plaintiff to be placed on tier 2F at the OJC. On information and belief, the Plaintiff should not have been placed on tier 2F because he was remanded to the Sheriff only for a Drug Court violation, rather than any serious charges regarding violation of law.  On information and belief, there were many inmates housed on tier 2F who were charged with serious violent crimes.  On information and belief, people who are remanded for short-term incarceration associated with a Drug Court violation are not supposed to be placed in general population at OJC.

11.      On information and belief, defendants **OPSO DEPUTY JOHNSON** and/or **UNKNOWN OPSO DEPUTIES JOHN DOES NOS. 2 and 3** were responsible for the care, custody and control of inmates housed on tier 2F on or about June 16, 2018.

12.     Tier 2F can be seen from a control module, which also houses video monitors showing surveillance video footage coming from the tier.

13.     On information and belief, one of the defendants, either **OPSO DEPUTY JOHNSON** and/or **UNKNOWN OPSO DEPUTIES JOHN DOES NOS. 2 and 3**, was assigned to be present on the tier on June 16, 2018.  Another one of these defendants was assigned to be in the control module.

14.     On or about June 16, 2018, the Plaintiff was approached by inmates on his tier. When they did so, on information and belief, these inmates signaled to **OPSO DEPUTY JOHNSON** or **UNKNOWN OPSO DEPUTIES JOHN DOES NOS. 2 and 3**, who were assigned to be present on the tier and/or were assigned to monitor the tier from inside a control module.

15.     When the inmates signaled to the deputy who was present in the tier (either **OPSO DEPUTY JOHNSON** or **UNKNOWN OPSO DEPUTIES JOHN DOES NOS. 2 or 3**) this deputy abandoned his post and left the tier.

16.     The inmates ordered the Plaintiff to leave his cell, which was located on the bottom level of tier 2F.  The inmates then ordered the Plaintiff to proceed to the upstairs or mezzanine level of tier 2F, where additional cells are located.  All cells on 2F are two-person cells.

17.     As the Plaintiff was approaching a cell on the upstairs mezzanine level, on information and belief, a defendant deputy, either **OPSO DEPUTY JOHNSON** or **UNKNOWN OPSO DEPUTIES JOHN DOES NOS. 2 or 3**, caused the cell door to open at the request of the inmates who were forcing the Plaintiff to come with them to

the cell.  Cell doors on the tier can be opened only via the computer terminal located in the control module or the computer monitor located at the deputy's desk inside the tier.

18.     After the inmates ordered the Plaintiff into the cell, four other inmates entered the cell behind him.  Another inmate then signaled a defendant deputy, either **OPSO DEPUTY JOHNSON** or **UNKNOWN OPSO DEPUTIES JOHN DOES NOS. 2 or 3**, to close the cell door.  This defendant deputy complied with the inmate's request, locking the Plaintiff in the cell with the four other inmates present.

19.     On information and belief, it is OPSO policy that inmates who are housed on the bottom level of a tier are not permitted to mingle with inmates housed on the upstairs level, and vice versa.  Instead, the upstairs inmates should be locked in their cells when the downstairs cells are open, and vice versa.  It is further OPSO policy that inmates are not allowed to enter cells that are not their own.  It is further OPSO policy that inmates are not allowed to congregate in groups inside cells.  It is further OPSO policy that guards should not open and close cell doors at the request of inmates.

20.     When the cell door closed and locked the Plaintiff inside the cell with the other inmates, one of them revealed a knife and told Plaintiff he would be killed if he did not comply with the inmates' demands.  The inmates then sexually assaulted the Plaintiff, claiming they were searching for contraband.

21.     After the inmates did not find any contraband, the Plaintiff was permitted to leave the cell.  He returned to his cell.  Another inmate followed him inside his cell, and again threatened his life.  This other inmate also assaulted the Plaintiff under the guise of searching him for contraband.

22.     On information and belief, throughout these assaults, the defendant deputies

**OPSO DEPUTY JOHNSON and/or UNKNOWN OPSO DEPUTIES JOHN DOES**

**NOS. 2 or 3** had abandoned their posts and/or were intentionally neglecting their duty to

protect the Plaintiff from violence at the hands of other inmates.  These defendants were

aware that Plaintiff was being assaulted by other inmates, or they should have been

aware of that risk based on the multiple blatant violations of facility policies that

occurred in front of them (e.g., multiple inmates congregating in a cell that was not their

own and requesting that the cell door be closed and locked).  These defendants in fact

assisted the inmates in perpetrating the assaults on the Plaintiff by leaving the tier,

ignoring violations of rules, and opening and closing cell doors at inmates' request.

23.     After the sexual assault, the Plaintiff had to remain on the same tier as those

who assaulted him.  Given the defendant deputies' general lack of control over the

facility and seeming complicity with the inmate-assailants, the Plaintiff feared for his

life if he reported the assault.

24.     Finally, Plaintiff was able to speak with different OPSO personnel.  He reported

he was suffering from blood in his urine so that he would be taken off the tier to

medical, which he was.  There, the Plaintiff reported the sexual assault to OPSO staff.

He was then taken to University Medical Center on June 18, 2018.  When he was

returned to OPSO later that same day, he was placed on Protective Custody ("PC")

status and housed on a different tier from 2F.

25.     On information and belief, under OPSO policies, a Protective Custody inmate

should not have any contact with any inmate named on the PC inmate's enemy list.

26.     On or about June 20, 2018, the Plaintiff was due to return to court.  As he was getting on the transport van, he saw that the primary assailant from the first attack, the one who had the knife, was on the van.  The Plaintiff told defendant **OPSO DEPUTY JOHNSON NO. 2** that he was not supposed to have any contact with that inmate because he was on Protective Custody.  **OPSO DEPUTY JOHNSON NO. 2** proceeded to ridicule the Plaintiff loudly and in front of the other inmates, making fun of him for having requested to be placed on PC and suggesting he was just trying to make it hard on deputies.  This conduct by **OPSO DEPUTY JOHNSON NO. 2** was extreme and outrageous, humiliating the Plaintiff and making him afraid for his life.  This conduct constitutes the state law tort of intentional infliction of emotional distress.

27.     Once he arrived at court, the Plaintiff was able to speak with a courtroom deputy whom he had gotten to know during his time in Drug Court.  The Plaintiff told this deputy what was happening.  Shortly afterwards, the criminal court judge ordered the Plaintiff's immediate release from custody.

28.     As a result of the assaults at OJC, the Plaintiff suffered both physical harm and mental suffering.  He continues to suffer profound mental and emotional trauma from the memories of these events, which continue to haunt him to this day.

29.     At all times mentioned herein, all the defendants named in their individual capacities were employed by the defendant, Sheriff **MARLIN N. GUSMAN**, and were acting in the course and scope of their employment with defendant **GUSMAN**.

30.     The assault on Plaintiff  was yet another example of the epidemic of violence among detainees held by the Orleans Parish Sheriff's Office.  The extremely high level of violence at the jail has been documented by the Department of Justice in CRIPA

letters issued in 2009 and 2012, and it was one of the primary reasons for a consent decree entered in June 2013 to govern operations at the jail.  But despite efforts to improve conditions at the jail, the extremely high level of violence has persisted.  A lack of supervision, staff misconduct, and inadequate classification practices (all causes of the injuries the Plaintiff received in this case) have been cited as primary drivers for this violence.

31.     As part of the consent decree litigation, docketed in this Court as *Jones et al. v. Gusman*, EDLA #12-cv-859, the Court has appointed a team of federal Monitors to periodically inspect the Orleans jail and report on conditions.  As shown in the Monitors' publicly available reports, there continues to be a serious and well-known problem of inmate-on-inmate violence at the OJC.  The last Monitors' Report issued before the assault on the Plaintiff deemed OJC "critically unsafe" for inmates and staff because of the levels of violence.  *See Rec. Doc.* 1143, EDLA #12-cv-859.  One of the primary drivers of this violence is a lack of staff on the tiers and a failure of staff to effectively supervise and manage tiers even when they are present.  There is also a well-documented problem with weapons being in the facility and with staff misconduct at OJC.

32.     As shown by the well-known problems at the jail and the consent decree litigation, prior to June 16, 2018, the defendant, Sheriff **MARLIN N. GUSMAN**, developed and maintained policies and/or customs exhibiting deliberate indifference to the Fourth, Eighth, and Fourteenth Amendment rights of persons in Orleans Justice Center, which deliberate indifference caused the violation of Plaintiff's rights.

9

33.     At all times relevant to this suit, it was the policy and/or custom of the defendant, Sheriff **MARLIN N. GUSMAN**, to staff facilities inadequately, which allowed preventable violence among prisoners to occur due to lack of supervision.

34.     At all times relevant to this suit, it was the policy and/or custom of the defendant, Sheriff **MARLIN N. GUSMAN**, to fail to have and properly administer an appropriate classification system for detainees at the jail.  An appropriate classification system would have prevented the harm suffered by the Plaintiff because he would not have been placed on tier 2F with extremely dangerous inmates.

35.     At all times relevant to this suit, it was the policy and/or custom of the defendant, Sheriff **MARLIN N. GUSMAN**, to inadequately supervise and train his deputies, including the individual defendant deputies, thereby failing to discourage further constitutional violations by failing to provide adequate protection and violence prevention for prisoners in his custody.  The defendant, Sheriff **MARLIN N. GUSMAN**, did not require appropriate in-service training or re-training of deputies who were known to have engaged in misconduct by failing to respond to violence and threats of violence, or other violations of OJC policies.

36.     At all times relevant to this suit, it was the policy and/or custom of the defendant, Sheriff **MARLIN N. GUSMAN**, to inadequately respond to instances of misconduct and deputy failures to perform duties required to maintain the safety of prisoners in his care.  **GUSMAN'S** inadequate responses included a refusal to terminate, suspend, discipline, warn, or in any way punish and/or re-train his deputies, including the defendant deputies, for incidents involving failures to perform duties or violations of

policies, thereby failing to discourage further constitutional violations by his deputies, including the defendant deputies in this case.

37.     The defendant, Sheriff **MARLIN N. GUSMAN**, knew or should have known of prior failures to perform duties on the part of the defendant deputies in this case. Sheriff **MARLIN N. GUSMAN** ignored these prior incidents and hired and/or retained these defendants nonetheless.  In the alternative, the defendant, Sheriff **MARLIN N. GUSMAN,** negligently hired and retained the individually named defendants in this case.

38.     The defendant, Sheriff **MARLIN N. GUSMAN**, is liable to the Plaintiff for damages as a result of his failure to provide adequate staffing levels for OJC and as a result of his failure to train and supervise the individually named defendants herein.

39.     The defendant, Sheriff **MARLIN N. GUSMAN**, by his failure to provide adequate security staffing levels in OJC, condoned, ratified and encouraged the violence occurring in the OJC, and the failure to protect individuals in his custody, including the failure to protect Plaintiff.

40.     The defendant, Sheriff **MARLIN N. GUSMAN**, knew or should have known that the inadequate training his staff received contributed to a pattern and practice of deputies failing to perform essential duties, including failing to stay at their assigned posts or committing blatant policy violations, resulting in a failure to protect individuals in his custody, including the failure to protect Plaintiff.

41.     The defendant, Sheriff **MARLIN N. GUSMAN**, by his failure to properly supervise the individually named defendants, condoned, ratified, and encouraged the

11

pattern and practice of failing to perform duties, including abandonment of posts and other misconduct, that contributes directly to the failure to protect individuals in his custody, including Plaintiff.

42.     The above-described actions and/or failures on the part of the defendant, Sheriff **MARLIN N. GUSMAN**, show a deliberate indifference toward the constitutional rights of the Plaintiff in this case.

43.     The above-described policies and customs demonstrate deliberate indifference on the part of the policy maker, Sheriff **MARLIN N. GUSMAN**, to the constitutional rights of persons within Orleans Justice Center, and to the Plaintiff in this case. These policies customs, actions, and inactions were both the factual and legal cause of the violation of the Plaintiff's rights alleged herein.

44.     All of the defendants are liable to the Plaintiff for compensatory and punitive damages.

45.     All of the defendants are liable jointly, severally, and in solido for the Plaintiff's injuries.

46.     The defendants' actions were reckless, willful, wanton, and malicious, and constitute deliberate indifference to the rights of the Plaintiff.  In the alternative, the defendants' actions were negligent and/or grossly negligent.

47.     Defendants, individually and collectively, had the duty and ability to intervene to prevent the violations of the rights of the Plaintiff described herein, but failed to do so.

## IV. CAUSES OF ACTION

48.     Plaintiff repeats and re-alleges each and every allegation of this Complaint.

49.     *Constitutional Violations.* The defendants, acting individually and together, under color of law, acted to violate the Plaintiff's right to be free from cruel and unusual punishment, the right to be free from unreasonable searches and seizures, and the right to due process and equal protection of the laws as protected by the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution and 42 USC § 1983.  At all pertinent times, the defendants, acting individually and collectively, acted unreasonably, recklessly, and with deliberate indifference and disregard for the safety, constitutional and civil rights of Plaintiff.

50.     *Constitutional Claim Against Defendant* **GUSMAN**.  Defendant **GUSMAN** established, condoned, ratified and encouraged customs, policies, patterns, and practices that directly and proximately caused the deprivation of Plaintiff's safety and his civil and constitutional rights.  Defendant **GUSMAN** knew of the levels of extreme violence in the OJC, the inadequate classification systems, the rampant misconduct of staff, and the chronic understaffing at the facilities under his control since 2009, but nevertheless continued to operate these facilities with minimal security staff and other deficiencies, allowing an intolerable risk of harm to come to those held in his custody, including Plaintiff.  Further, defendant **GUSMAN** knew of the failures to perform duties, blatant and rampant violations of policies, and abandonment of posts by deputies under his supervision, yet failed to train or discipline deputies who engaged in these behaviors.  At all pertinent times herein, defendant **GUSMAN** acted unreasonably and with deliberate indifference and disregard for the safety of Plaintiff.

51.     *State law Torts Against Defendant GUSMAN.*  At all times relevant hereto, all individually named defendants were acting within the course and scope of their

13

employment with defendant, Sheriff **MARLIN N. GUSMAN**.  Therefore, the doctrine

of respondeat superior applies for all state-law torts alleged in this Complaint and

defendant **GUSMAN** is liable to the Plaintiff for the tortious acts of his employees.

## V. DAMAGES

52.      As a result of the above-described civil rights violations, Plaintiff

suffered physical injuries, mental and emotional pain and suffering, anguish and distress,

embarrassment, humiliation, and possible medical expenses, all as will be determined at

a trial of this matter.

53.      In addition to recovering damages, Plaintiff seeks reasonable attorneys' fees

in accordance with 42 U.S.C. § 1988, plus judicial interest, and for the defendants to

bear all costs of these proceedings.

## IV. PRAYER FOR RELIEF

**WHEREFORE**, the plaintiff, **W.P.**, prays the defendants be duly cited and

served copies of the above and foregoing, made to timely appear and answer, that the

Court exercise its supplemental jurisdiction over the state law claims, and after due

proceedings there be a judgment in his favor and against all defendants named herein,

holding them liable jointly, severally, and in solido as follows:

1.      Compensatory and punitive damages alleged herein, together with judicial
    interest,

2.      All attorney's fees as provided in 42 U.S.C. §1988, and that the defendants
    bear all costs of these proceedings and all legal interest

3.      All further legal, equitable, and general relief available.

14

Respectfully submitted,

/s/ Stephen J. Haedicke

_____
**STEPHEN J. HAEDICKE** (Bar Roll No. 30537)
1040 Saint Ferdinand St.
New Orleans, LA 70117
(504)291-6990 Telephone
(504)291-6998 Fax
stephen@haedickelaw.com